IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>)<br>Plaintiff,  )<br>)<br>vs.  )<br>)<br>VIROK D. WEBB,  )<br>)<br>Defendant.  )<br>)<br>_____)  | Case No. 11-40078-01-JAR |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion to Suppress Defendant's Statements (Doc. 341). The Court held an evidentiary hearing on September 19, 2013, where it took the motion under advisement. Having reviewed the briefs, evidence, and arguments presented by the parties, the Court is now prepared to rule. As described more fully below, the Court denies Defendant's motion.

**I.  Facts**

Based on the testimony, video[1] and other evidence[2] submitted at the suppression hearing, the Court finds the following facts by a preponderance of the evidence. Detective Joshua Brown is a narcotics detective with the Junction City Police Department and testified that he knew Defendant to be a "drug dealer." Detective Brown first met Defendant no later than 2006, and has since encountered Defendant numerous times while on patrol. The day after Crystal Fisher's

---

[1] *See* Gov't Ex. 1.

[2] *See* Gov't Ex. 2 (Defendant's signed *Miranda* waiver of June 29, 2010), Gov't Ex. 3 (U.S. Department of Justice Drug Enforcement Administration Report documenting allegations of Defendant and Co-Defendant Webb's drug distribution activity).

murder, Defendant's attorney at the time, Brenda Jordan, contacted the Junction City Police Department to report that she was Defendant's attorney. Defendant's attorney advised that officers were not allowed to have any conversations with Defendant regarding his alleged involvement in Crystal Fisher's murder.

On June 22, 2010, Detective Brown was patrolling Junction City in an unmarked vehicle and dressed in plain clothing when he noticed Defendant's car stalled in the parking lot of an apartment complex. Detective Brown testified that Defendant waved him over to his car. Detective Brown drove to Defendant's vehicle and informed him that he could not speak with him because he had an attorney. However, Defendant continued to make statements about Crystal Fisher's murder and related drug activity. Detective Brown did not read Defendant his *Miranda* rights because he did not think Defendant was in custody. Detective Brown testified that Defendant initiated the conversation and could have walked away at any time. This encounter was not videotaped.

On June 29, 2010, Defendant was in a holding cell at the Junction City Police Department following his arrest for domestic battery and drug possession when Detective Brown passed by him. Defendant told him that he wished to speak with Detective Brown. Detective Brown testified that he confirmed with a supervisor that he could indeed talk with Defendant. Defendant was then moved to an interview room with Detective Brown where the matter was recorded.[3] The interview began with Detective Brown taking Defendant's personal identification information. Immediately following, Defendant told Detective Brown that he completed one year of college and can read and write. Detective Brown then advised Defendant of his *Miranda*

---

[3]*See* Gov't Ex. 1.

rights, which were enumerated one through five on a Junction City waiver form and read to Defendant.[4] Detective Brown stopped to confirm that Defendant understood each separate right. Defendant first attempted to offer confirmation by nodding his head. Detective Brown explained to Defendant that the process had to be formal so Defendant must respond verbally. Defendant then verbally confirmed that he understood all warnings covered under *Miranda* after each of the five warnings were read to him. Finally, in a catch-all question, Detective Brown again confirmed that Defendant understood all five previously stated warnings. Defendant then verbally agreed to waive his *Miranda* rights. Both Defendant and Detective Brown then signed a written *Miranda* waiver, containing all of the *Miranda* rights and responses that Defendant provided regarding his comprehension of each right.[5]

Detective Brown began the interview by asking "What happened?" Defendant responded by discussing the details of the domestic dispute for which he was under arrest. Detective Brown asked several questions about the dispute and took notes. Defendant quickly admitted to hitting the victim with an open hand. After approximately two minutes, Detective Brown and Defendant segued to a dialogue, which last about two-and-half minutes, about whether or not Defendant wanted to waive his right to an attorney as to the Crystal Fisher homicide. Detective Brown asked Defendant what Defendant wanted to discuss, and Defendant responded, "I want to alleviate the situation." When Detective Brown asked what "situation" Defendant was responding to, Defendant replied, "The whole situation." Detective Brown told Defendant that before they continued the interview, he had to state on the record that he wanted to waive his

---

[4] *See* Gov't. Ex. 2.

[5] *Id.*

3

right to an attorney about "this stuff." Then, Detective Brown made several attempts to clarify that Defendant wanted to waive his right to an attorney as to the Crystal Fisher homicide. Defendant laughed twice when Detective Brown told him that he needed to give a verbal waiver as to the homicide case. When asked again by Detective Brown what he wanted to talk about, Defendant replied, "Whatever you wanna talk about." Finally, Defendant verbally agreed to speak to Detective Brown about the Crystal Fisher homicide without his attorney. Detective Brown then asked one last time if Defendant requested an interview with him to specifically discuss the Crystal Fisher homicide case. Defendant replied, "I know that's what you want." Defendant then went on, for about two hours, to discuss his relationship with Crystal Fisher and his distribution of illegal drugs.

## II.     Discussion

### 1.     Defendant's Statements on June 22, 2010 in parking lot

Defendant argues that his statements on June 22, 2010, were obtained without the presence of Defendant's retained attorney and thus, in violation of *Miranda*.[6] Under *Miranda*, the prosecution may not use certain statements unless it demonstrates that it employed certain procedural protections to safeguard the Fifth Amendment privilege against self-incrimination.[7] As a general rule:

> *Miranda* warnings are required when the defendant is in custody and subject to interrogation. In order to determine whether or not a person is in custody for *Miranda* purposes, a court must examine all relevant facts, the only relevant inquiry being how a reasonable person in the suspect's position would have understood his situation. If, from an objective

---

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[7]*Id.* at 444.

4

> viewpoint, someone in [the defendant's] position would reasonably
> believe [his] freedom of action had been curtailed to a degree associated
> with a formal arrest, then [he] would be held in custody during the
> interrogation.[8]

Thus, a *Miranda* warning is required when a defendant is (1) subject to interrogation, *and* (2) in custody. For the first prong, interrogation includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[9] For the second prong, the Tenth Circuit suggests several factors that are useful in testing the atmosphere of custody, including: the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will; the nature of questioning (limited questioning to confirm an officer's suspicions is less coercive than prolonged accusatory questioning); and whether the atmosphere is "police dominated" (i.e. separation of the suspect from family or colleagues who could offer moral support, isolation in nonpublic questioning rooms, threatening presence of several officers, display of a weapon by an officer, physical contact with the subject, and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled).[10]

Here, Defendant was not interrogated within the meaning of *Miranda*. Detective Brown did not invite a discussion about the Crystal Fisher homicide or his illegal drug activity. Furthermore, Detective Brown was aware Defendant retained an attorney in this matter and had been advised not to talk to Defendant without the attorney present. Detective Brown attempted

---

[8]*United States v. Griffin*, 7 F.3d 1512, 1517–18 (10th Cir. 1993) (citing *Miranda*, 384 U.S. at 444) (citations and quotations omitted).

[9]*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted).

[10]*Griffin*, 7 F.3d at 1518–19; *see also United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

to follow this direction by reminding Defendant that he could not speak to him without his attorney present. Still, Defendant continued to discuss the homicide and his illegal drug activity. However, Detective Brown cannot prevent Defendant from acting according to Defendant's will — even if that means waiving previously invoked Miranda rights. "Volunteered statements of any kind are not barred by the Fifth Amendment."[11] Detective Brown could not have reasonably believed that his words or actions would elicit an incriminating response from Defendant. Therefore, the first prong is not satisfied.

Defendant was also not in "custody" within the meaning of *Miranda*. Detective Brown did not initiate contact and only came over once Defendant waved him over Defendant does not allege that Detective Brown made specific statements or acted in a way that suggested he could not leave. Defendant also does not allege that the atmosphere was police dominated. Defendant was in a public space, not the police station or a squad car. Detective Brown was the only officer on the scene; he was driving an unmarked car and dressed in plain clothes. While Defendant's own car troubles prevented him from driving away from the scene, he certainly could have walked away by his own volition. From an objective viewpoint, someone in Defendant's position could not reasonably believe his freedom of action had been curtailed to a degree associated with a formal arrest. Therefore, the second prong is not satisfied.

Defendant was not interrogated or in custody, therefore the statements Defendant made on June 22, 2010 are admissible because they were not obtained in violation of *Miranda*.

**2.     Defendant's Statements on June 29, 2010 in jail**

Defendant argues that his statements on June 29, 2010 merit suppression because waiver

---

[11]*Miranda*, 384 U.S. at 478.

of his Miranda rights was not voluntary, knowing, and intelligent. A defendant may waive *Miranda* rights, but the waiver of one's Fifth Amendment privilege against self-incrimination must be voluntary, knowing and intelligent.[12] The purpose of the "knowing and voluntary" inquiry is to ascertain whether the defendant truly does understand the significance and consequences of his decision and whether the decision is uncoerced.[13] A waiver is considered to be knowing and intelligent only if the defendant made it with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[14] Whether this standard is met "depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."[15] The Government has the burden of proving a valid waiver.[16]

Defendant argues that his waiver was not voluntary in this matter and that he only waived his *Miranda* rights as to the domestic violence situation for which he was arrested that night. Notably, Defendant appears to be intentionally evasive throughout the interview process. Defendant first tried to waive his rights by nodding, rather than offering a verbal response as he had done before the interview. Only after Detective Brown reminded Defendant that he was required to verbally respond did he speak. Detective Brown also gave Defendant the opportunity to clarify what he wanted to discuss when Defendant specifically requested to be interviewed by

---

[12]*See Moran v. Burbine*, 475 U.S. 412, 421 (1986) (internal citations ommitted).

[13]*Godinez v. Moran*, 509 U.S. 389, 400–01 (1993).

[14]*Moran*, 475 U.S. at 421.

[15]*Maynard v. Boone*, 468 F.3d 665, 676 (10th Cir. 2006).

[16]*United States v. Nelson*, 450 F.3d 1201, 1210–11 (10th Cir. 2006).

him.  Defendant did not give specific details when Detective Brown asked what he wanted to talk to him about.  Instead, Defendant responded that he wanted to "alleviate the situation." Detective Brown then attempted to clarify what situation Defendant was referring to, only for Defendant to respond, "The whole situation."  Even after Detective Brown asked Defendant if he called him over to specifically speak about the Crystal Fisher homicide, Defendant did not offer a direct response, but instead retorted, "I know that's what you want."  Defendant never made any statements or assertions to suggest that he was limiting the scope of the waiver to the domestic violence situation.

Defendant alleged that Detective Brown made an extended effort to get Defendant to talk about the Crystal Fisher homicide case when he was reluctant to do so.  The Court disagrees. Defendant did not appear reluctant.  Approximately two minutes into the interview, Defendant admitted that he wanted to talk about the Crystal Fisher homicide.  Defendant even laughed when Detective Brown attempted to be serious and formal by eliciting a clear, explicit waiver. Defendant also alleged that he slowly agreed to a waiver because of Detective Brown's many attempts to  pressure him.  The Court finds that the video evidence does not support Defendant's assertion that he was pressured.  Detective Brown's questions were an exhibition of caution in the face of Defendant's intentional evasiveness.  Detective Brown made several attempts to ensure that Defendant was waiving his rights to an attorney specifically in the Crystal Fisher homicide case even after Defendant had given a blanket verbal and written waiver.  Detective Brown's tone of voice was controlled—not forceful—throughout the entire interview.  Defendant initiated the interview and Defendant explicitly stated that he wanted to waive his right to have an attorney present to discuss the Crystal Fisher homicide.  Defendant cannot now back peddle

and say that he was cajoled into waiving his rights. Thus, the Court finds Defendant's waiver was voluntary.

Defendant also argues that his waiver was not knowing and intelligent. Defendant established that he is literate and has completed one year of college. Defendant signed a written waiver before he gave any statements and verbally confirmed that he understood each right protected by *Miranda* after they were read aloud to him. Moreover, Detective Brown reminded Defendant several times that the waiver needed to be formal and clear and even suggested that civil rights violations could occur if they were not formal. Even after Defendant waived his rights verbally and in writing, Detective Brown again clarified that Defendant wanted to waive his rights as to the Crystal Fisher homicide case. Given Defendant's educational background, the various opportunities Defendant had to limit his waiver, and Detective Brown's repeated warnings about the gravity of the case, the Court finds Defendant understood the significance and consequences of his decision to speak without his attorney present and was aware of the nature and consequences of his waiver. Therefore, the Court also finds Defendant's waiver was knowing and intelligent.

Because the Government has met its burden of showing that the waiver of Defendant's statements was valid, Defendant's statements on June 29, 2010 are also admissible.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion to Suppress Defendant's Statements (Doc. 341) is **denied**.

Dated: October 28, 2013

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE